Slip Op. 12 - 9

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GROBEST & I-MEI INDUSTRIAL (VIETNAM) CO., LTD., *et al.*,<br><br>          Plaintiffs,<br><br>          v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE, *et al.*,<br><br>          Defendant-<br>               Intervenors. | Before: Donald C. Pogue, Chief Judge<br><br>Consol. Court No. 10-00238 |

OPINION AND ORDER

[Remanding Department of Commerce's final results of administrative review of antidumping duty order]

Dated: January 18, 2012

David S. Christy and Matthew R. Nicely, Thompson Hine LLP, of Washington, D.C., for the Plaintiff Grobest & I-Mei Industrial (Vietnam) Co., Ltd.

Robert G. Gosselink and Jonathan M. Freed, Trade Pacific, PLLC, of Washington, D.C., for the Consolidated Plaintiffs Cam Ranh Seafoods Processing Enterprise Co.; Contessa Premium Foods Inc.; and H&N Foods International.

Adams Chi-Peng Lee, Jay C. Campbell, and Walter J. Spak, White & Case, LLP, for the Consolidated Plaintiff Amanda Foods (Vietnam) Ltd.

Matthew R. Nicely, Thompson Hine LLP, of Washington, D.C., for the Consolidated Plaintiffs Nha Trang Fisheries Joint Stock Co.; Nha Trang Seaproduct Co.; Minh Phu Seafood Corp.; Minh Qui Seafood Co., Ltd.; Bac Lieu Fisheries Joint Stock Co.; Camau Frozen Seafood Processing Import Export Corp.; Ca Mau Seafood Joint Stock Co.; Cadovimex Seafood Import-Export and Processing Joint-Stock Co.; Cafatex Fishery Joint Stock Corp.; Cantho Import Export Fishery Ltd. Co.; C.P. Vietnam Livestock Corp.; Cuulong

Seaproducts Co.; Danang Seaproducts Import Export Corp.;
Investment Commerce Fisheries Corp.; Minh Hai Export Frozen
Seafood Processing Joint-Stock Co.; Minh Hai Joint-Stock Seafoods
Processing Co.; Ngoc Sinh Private Enterprise; Phu Cuong Seafood
Processing & Import-Export Co., Ltd; Phuong Nam Co. Ltd.; Sao Ta
Foods Joint Stock Co.; Soc Trang Seafood Joint Stock Co.; Thuan
Phuoc Seafoods and Trading Corp.; UTXI Aquatic Products
Processing Corp.; Viet Foods Co., Ltd.; and Minh Phat Seafood
Co., Ltd.

   Joshua E. Kurland, Trial Attorney, Commercial Litigation
Branch, Civil Division, U.S. Department of Justice, of
Washington, D.C., for Defendant United States.  With him on the
brief were Tony West, Assistant Attorney General, Jeanne E.
Davidson, Director, Patricia M. McCarthy, Assistant Director.

   Nathaniel J. Maandig Rickard, Andrew W. Kentz, Jordan C.
Kahn, and Kevin M. O'Connor, Picard, Kentz & Rowe, LLP, of
Washington D.C. for Defendant-Intervenor Ad Hoc Shrimp Trade
Action Committee.

   Robert G. Gosselink and Jonathan M. Freed, Trade Pacific,
PLLC, of Washington, D.C., for Defendant-Intervenors Cam Ranh
Seafoods Processing Enterprise Co.; Contessa Premium Foods Inc.;
and H&N Foods International.

   Matthew R. Nicely and David S. Christy, Thompson Hine LLP,
of Washington, D.C., for Defendant-Intervenors Minh Phu Seafood
Corp.; Minh Phat Seafood Co., Ltd.; Minh Qui Seafood Co., Ltd.;
and Nha Trang Seaproduct Co.

   Geert M. De Prest and Elizabeth J. Drake, Stewart and
Stewart, of Washington D.C., and Edward T. Hayes, Leake &
Anderson, LLP, of New Orleans, LA, for the Defendant-Intervenor
American Shrimp Processors Association.

   **Pogue, Chief Judge:** This is a consolidated action seeking

review of determinations made by the United States Department of

Commerce ("Commerce" or "the Department") in the fourth

administrative review of the antidumping duty order covering

certain frozen warmwater shrimp from the Socialist Republic of

Vietnam ("Vietnam").[1]  Plaintiffs Grobest & I-Mei Industrial

(Vietnam) Co., Ltd. ("Grobest"), Nha Trang Seaproduct Company, *et

al.* ("Nha Trang"), and Cam Ranh Seafoods Processing Enterprise

Company, *et al.* ("Cam Ranh"); Consolidated Plaintiff Amanda Foods

(Vietnam) Ltd. ("Amanda Foods"); and Defendant-Intervenor Ad Hoc

Shrimp Trade Action Committee ("AHSTAC") now seek judgment on the

agency record, <u>see</u> USCIT R. 56.2, raising for review seven of

Commerce's determinations, findings, or conclusions.

   Specifically, Plaintiffs Grobest, Nha Trang, and Cam Ranh

collectively challenge Commerce's decision to use zeroing in

calculating dumping margins during reviews but not during

investigations.  These Plaintiffs also challenge the exclusion of

Bangladesh-to-Bangladesh import data from surrogate value

calculations and the use of multi-country averaging in

determining surrogate labor wage rates.

   Defendant-Intervenor AHSTAC challenges Commerce's exclusion

of Fine Foods Ltd.'s 2008-2009 financial statement and Gemini Sea

Food Ltd.'s loading and unloading expenses when calculating

surrogate financial ratios.

   Plaintiff Grobest also challenges Commerce's denial of its

---

[1] <u>Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam</u>, 75 Fed. Reg. 47,771 (Dep't Commerce Aug. 9,
2010) (final results and partial rescission of antidumping duty
administrative review) ("<u>Final Results</u>"), and accompanying Issues
& Decision Memorandum, A-552-802, ARP 08-09 (July 30, 2010),
Admin. R. Pub. Doc. 233 ("<u>I & D Mem.</u>") (adopted in <u>Final Results</u>,
75 Fed. Reg. at 47,772).

request for revocation, and Consolidated Plaintiff Amanda Foods

challenges Commerce's rejection of its separate rate

certification on the basis of untimely filing.

The court has jurisdiction pursuant to § 516A(a)(2)(b)(iii)

of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(iii) (2006)[2] and 28 U.S.C. § 1581(c) (2006).

The court discusses below each of the seven issues raised

for review.  The court concludes, using the following outline,

that: (I) Commerce must provide further explanation for its use

of zeroing in antidumping reviews but not investigations,

consistent with recent decisions of the Court of Appeals for the

Federal Circuit; (II) Commerce's decisions to exclude the

Bangladesh-to-Bangladesh data from surrogate value calculations,

to employ multi-country averaging to determine surrogate labor

wage rates, and to exclude both Fine Foods' 2008–2009 financial

statement and Gemini's loading and unloading expenses from

surrogate financial ratio calculations are reasonable and will,

therefore, be affirmed; (III) Commerce's decision not to review

voluntary respondents under 19 U.S.C. § 1677m(a) is based on an

impermissible construction of the relevant statutory provisions;

and (IV) Commerce's decision to reject Amanda Foods' untimely

submitted separate rate certification was an abuse of discretion.

---

[2] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2006 edition.

Accordingly, the court will remand the <u>Final Results</u> to Commerce for reconsideration and redetermination consistent with this opinion.

<b>BACKGROUND</b>

The following background information is relevant to the seven issues before the court.[3]  On March 26, 2009, Commerce, at the request of the domestic producers and certain Vietnamese respondents, initiated the fourth administrative review[4] of the 2005 antidumping duty order on certain frozen warmwater shrimp from Vietnam[5] (the "Order").  Commerce issued the preliminary results of its review on March 15, 2010, assigning preliminary dumping margins of 3.27% to mandatory respondent Minh Phu; 2.5% to mandatory respondent Nha Trang; 2.89% to the non-selected, separate rate respondents; and as the Vietnam-wide rate, 25.76%.[6]

---

[3] Because this is a consolidated action, some factual information is relevant only to individual claims, and this will be provided as part of the discussion of individual issues.

[4] <u>Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam and the People's Republic of China</u>, 74 Fed. Reg. 13,178 (Dep't Commerce Mar. 26, 2009) (notice of initiation of administrative reviews and requests for revocation, in part, of the antidumping duty orders).

[5] <u>Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam</u>, 70 Fed. Reg. 5,152 (Dep't Commerce Feb. 1, 2005) (notice of amended final determination of sales at less than fair value and antidumping duty order).

[6] <u>Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam</u>, 75 Fed. Reg. 12,206, 12,215 (Dep't Commerce

After taking comments from interested parties, Commerce released

the final results of the review on August 9, 2010. <u>Final Results</u>,

75 Fed. Reg. at 47,771.  In the <u>Final Results</u>, Commerce assigned

Minh Phu a 2.96% rate, Nha Trang a 5.58% rate, the separate rate

respondents a 4.27% rate, and a rate of 25.76% as the Vietnam-

wide rate. <u>Id.</u> at 47,774-75.[7]


## STANDARD OF REVIEW

When reviewing the Department's decisions made in

administrative reviews of antidumping duty orders, the Court

"shall hold unlawful any determination, finding, or conclusion

found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).

---

Mar. 15, 2010) (preliminary results, partial rescission, and
request for revocation, in part, of the fourth administrative
review) ("<u>Preliminary Results</u>").

   [7]  Commerce later amended the final results reducing Minh
Phu's rate to 2.95%, Nha Trang's to 4.89%, and the separate rate
respondents to 3.92%, but keeping the Vietnam-wide rate at
25.76%. <u>Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam</u>, 75 Fed. Reg. 61,122, 61,123-26 (Dep't
Commerce Oct. 4, 2010) (amended final results of antidumping duty
administrative review) ("<u>Amended Final Results</u>").  The final
results were amended due to ministerial errors made by Commerce
in calculating surrogate values and surrogate financial ratios.
<u>Id.</u> at 61,123.

**DISCUSSION**

I.    Commerce's Use of Zeroing in Investigations but Not Reviews

Where, as here, Commerce and the International Trade Commission determine that imported goods are being sold at less than fair value in the United States to the detriment of domestic industry, the statute directs Commerce to impose an antidumping duty on those imported goods "equal to the amount by which the normal value[8] exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673.[9] Commerce calculates dumping duties by first determining a dumping margin, or "the amount by which the normal value exceeds the export price or constructed export price," 19 U.S.C. § 1677(35)(A), and then establishing a weighted average dumping margin, which is "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer," § 1677(35)(B).

When calculating weighted average dumping margins, Commerce may, under the statute, employ either of two methodologies:

---

[8] The statute defines "normal value" as "the price at which the foreign like product is first sold . . . for consumption in the exporting country . . . ." 19 U.S.C. § 1677b(a)(1)(B)(i).

[9] When a producer or exporter sells goods in the United States at a price below that at which the producer or exporter sells the same or comparable goods in its home market, those goods are considered dumped.

zeroing or offsetting. Timken Co. v. United States, 354 F.3d

1334, 1341-45 (Fed. Cir. 2004) (holding that 19 U.S.C. § 1677(35)

is ambiguous and that zeroing is a reasonable interpretation);

U.S. Steel Corp. v. United States, 621 F.3d 1351, 1360-63 (Fed.

Cir. 2010) (holding that 19 U.S.C. § 1677(35) is ambiguous and

that offsetting is also a reasonable interpretation).  Zeroing is

the practice of "treat[ing] transactions [or sales] that generate

'negative' dumping margins (i.e., a dumping margin with a value

less than zero) as if they were zero." Timken, 354 F.3d at 1338.

Under this approach, only sales at less than normal value

contribute to the calculation of the dumping margin.  In

contrast, when using offsetting, "sales made at less than fair

value are offset by those made above fair value. This means that

some of the dumping margins used to calculate a weighted-average

dumping margin will be negative." U.S. Steel, 621 F.3d at 1355.

Historically, Commerce has employed zeroing methodology in

both antidumping duty investigations and reviews. See Timken, 354

F.3d at 1338 (reviewing use of zeroing in an antidumping duty

administrative review); Corus Staal BV v. Dep't of Commerce, 395

F.3d 1343 (Fed. Cir. 2005) (reviewing use of zeroing in an

antidumping duty investigation).  However, in 2005, the European

Community successfully challenged Commerce's use of zeroing, in

investigations, before the World Trade Organization ("WTO"), a

decision upheld by the WTO's Appellate Body in 2006. U.S. Steel,

621 F.3d at 1354 (citations omitted).  In response to the adverse ruling before the WTO, Commerce changed its methodology in antidumping investigations, choosing to use offsetting instead of zeroing, id. at 1354-55, but continued to use zeroing in other segments of antidumping proceedings, including administrative reviews, id. at 1355 n.2.[10]

Plaintiffs in this case challenge Commerce's use of zeroing, in the fourth administrative review, as an impermissibly inconsistent interpretation of a single statutory provision. Plaintiffs argue that Commerce may not reasonably read the same statutory provision, 19 U.S.C. § 1677(35), to permit concurrent use of zeroing and offsetting. Pls.' Mem. Supp. Mot. J. Agency R. 15-17, ECF No. 67-2 ("Pls.' Br.").  Commerce argues before this court only that Plaintiffs failed to raise the issue of inconsistent interpretations before the agency and have, therefore, not exhausted their administrative remedies. Def.'s Mem. Opp'n Pls.' Mot. J. Agency R. 34-39, ECF No. 102 ("Def.'s Resp. Br.").

The issue has currency because of two recent decisions from the Court of Appeals for the Federal Circuit, Dongbu Steel Co. v. United States, 635 F.3d 1363 (Fed. Cir. 2011) and JTEKT Corp. v.

---

[10] For the full discussion of Commerce's change in policy see Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation, 71 Fed. Reg. 77,722 (Dep't Commerce Dec. 27, 2006) (final modification).

United States, 642 F.3d 1378 (Fed. Cir. 2011), which have

addressed Commerce's inconsistent interpretations of 19 U.S.C.

§ 1677(35). Dongbu held that "[i]n the absence of sufficient

reasons for interpreting the same statutory provision

inconsistently, Commerce's action is arbitrary." 635 F.3d at

1372-73. Subsequently, JTEKT concluded that "[w]hile Commerce

did point to differences between investigations and

administrative reviews, it failed to address the relevant

question — why is it a reasonable interpretation of the statute

to zero in administrative reviews, but not in investigations?"

642 F.3d at 1384. In light of these decisions, the court will

remand this issue to Commerce for reconsideration and

redetermination consistent with now prevailing law.[11] See also

_____

[11] As the decision in Dongbu was not available prior to the
final results in this administrative review, the court does not
credit Commerce's exhaustion argument. See JTEKT, 642 F.3d at
1384 ("[Appellant] did not have the benefit of the Dongbu opinion
before filing its briefs and thus could not have argued that the
case requires us to vacate, but it nonetheless preserved the
issue on appeal by arguing that Commerce's continuing practice of
zeroing in administrative reviews, but not in investigations, is
unreasonable."). The Defendant-Intervenor, citing Hormel v.
Helvering, 312 U.S. 552, 559 (1941), claims that the Federal
Circuit's decisions in Dongbu and JTEKT are not intervening
judicial decisions justifying Plaintiffs' failure to exhaust
because the decisions do not materially alter the result required
in this proceeding, but merely require "Commerce to explain its
authority for continuing to use zeroing in administrative
reviews." Def.-Intervenor's Resp. Pls.' Mot. J. Agency R. 26, ECF
No. 87 ("Def.-Intervenor's Resp. Br."). But Hormel requires only
that the intervening judicial decision "might" have affected the
result. Hormel, 312 U.S. at 558-59. Moreover, the Defendant-
Intervenor does not claim that application of the Federal
Circuit's decisions in Dongbu and JTEKT will not materially alter

Union Steel v. United States, 35 CIT __, Slip. Op. 11-144, *20

(Nov. 21, 2011) ("The court concludes, upon reconsidering its

decision in Union II, that it is appropriate to set aside its

affirmance of the use of zeroing and to direct Commerce to

provide the explanation contemplated by the Court of Appeals in

Dongbu and JTEKT Corp. . . . .").

II.  Commerce's Surrogate Value Determinations

        In order to determine a dumping margin, as discussed above,

Commerce must first establish the normal value of the subject

merchandise.  However, if the merchandise is exported from a

nonmarket economy ("NME") country,[12] the in-country price is

presumed to be unreliable, and Commerce is directed to "determine

the normal value of the subject merchandise on the basis of the

value of the factors of production utilized in producing the

merchandise and to which shall be added an amount for general

expenses and profit plus the cost of containers, coverings, and

other expenses." 19 U.S.C. § 1677b(c)(1).  "[T]he valuation of

_____

the result, only that it *may not* alter the result.  It is equally
clear that application of Dongbu and JTEKT may materially alter
the result.  If application of these intervening judicial
decisions does not materially alter the result, remand will be
harmless.

        [12] A nonmarket economy country is defined as "any foreign
country that [Commerce] determines does not operate on market
principles of cost or pricing structures, so that sales of
merchandise in such country do not reflect the fair value of the
merchandise." 19 U.S.C. § 1677(18)(A).  None of the parties
dispute that Vietnam is an NME.

the factors of production shall [in turn] be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce] [i.e., the surrogate market economy country]." Id.

Though the statute does not define "best available information" it does require Commerce to "utilize, to the extent possible, the prices or costs of factors of production in one or more [surrogate] market economy countries that are (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." § 1677b(c)(4).[13]

Commerce has wide discretion in selecting surrogate value data.  "[T]he process of constructing foreign market value for a producer in a nonmarket economy country [using surrogate values] is difficult and necessarily imprecise[,]" and, "[w]hile § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines." Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (citation omitted) (internal quotation marks omitted).  The court will not reverse Commerce's

---

[13] For the administrative review under consideration, Commerce chose Bangladesh as the surrogate market economy. Mem. from Bobby Wong, Senior Analyst, to Scot Fullerton, Program Manager, 1 (Mar. 8, 2010), Admin. R. Pub. Doc. 176 ("Surrogate Value Mem.").  No party challenges this determination.

surrogate value decision or data choice because an alternative

inference or conclusion could be drawn from the evidence. Daewoo

Elec. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach.

Workers, 6 F.3d 1511, 1520 (Fed. Cir. 1993) ("[T]he possibility

of drawing two inconsistent conclusions from the evidence does

not prevent an administrative agency's finding from being

supported by substantial evidence." (quoting Matsushita Elec.

Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)).

"[The] court's duty is 'not to evaluate whether the information

Commerce used was the best available, but rather whether a

reasonable mind could conclude that Commerce chose the best

available information.'" Zhejiang DunAn Hetian Metal Co. v.

United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting

Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F.

Supp. 2d 1323, 1327 (2006)); see also Peer Bearing Co.-Changshan

v. United States, 27 CIT 1763, 1770, 298 F. Supp. 2d 1328, 1336

(2003) ("The Court's role . . . is not to evaluate whether the

information Commerce used was the best available, but rather

whether Commerce's choice of information is reasonable.").

    As noted above, Plaintiffs and Defendant-Intervenor

challenge several of Commerce's decisions or data choices

concerning surrogate values, surrogate financial ratios, and

surrogate labor wage rates.  These determinations are discussed

individually below.

    A.    *Exclusion of Bangladesh-to-Bangladesh Import Data from Valuation of Factors of Production*

As noted above, Bangladesh was chosen as the surrogate market economy country for this administrative review. The Department used United Nations ComTrade Statistics as its primary source of surrogate value data for factors of production in Bangladesh. <u>Preliminary Results</u>, 75 Fed. Reg. at 12,214. In the <u>Final Results</u>, Commerce chose to exclude imports into Bangladesh that were listed in the ComTrade data as originating from Bangladesh. Commerce reasoned that goods moving from Bangladesh-to-Bangladesh could not be considered imports. <u>I & D Mem.</u> Cmt. 6 at 21. Thus, Commerce concluded that "[b]ecause the constitution of this data is unclear, we do not find that it represents the best available information upon which to rely for valuation purposes." <u>Id.</u>

Plaintiffs argue that Commerce erred in excluding the Bangladesh-to-Bangladesh data because the result was to distort the values of the affected factors of production.[14] Pls.' Br. 25-27. Plaintiffs further argue that Commerce's decision to exclude the Bangladesh-to-Bangladesh data was inconsistent with

_____

[14] According to an example provided by the Plaintiffs, "the altered price for cartons in the [<u>Final Results</u>] is dramatically higher than the value in the first review, second review, third review, and preliminary results of the fourth review, by the following percentages: 432 percent higher, 375 percent higher, 259 percent higher, and 355 percent higher, respectively." Pls.' Br. 23.

Commerce's prior practice because the Bangladesh-to-Bangladesh data did not fall into one of three enumerated categories of data that Commerce generally excludes from consideration.[15] Id. at 25.

Commerce contends, as it did at the administrative level, that the nature of the Bangladesh-to-Bangladesh data is uncertain, which it believes is a sound basis for excluding the data as not the best available information. Def.'s Resp. Br. 28-30; I & D Mem. Cmt. 6 at 21.  Commerce further contends that the data should be excluded without recourse to its prior enumerated categories because the Bangladesh-to-Bangladesh data is, by definition, not import data. Def.'s Resp. Br. 29.

On this record, Commerce's decision is reasonable.  As

---

[15] To identify the three enumerated categories of excludable data, Plaintiffs point to the following statement in the Department's Issues and Decision Memorandum accompanying the Final Results in the third administrative review of this antidumping duty order:

It is the Department's established practice, when using import data as a surrogate value source, to use the AUV for the input imported from *all* countries, with three exceptions: imports from countries that the Department has previously determined to be NME countries, imports from countries which the Department has determined subsidize exports, and imports that are labeled as originat[ing] from an "unspecified" country.

Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam, 74 Fed. Reg. 47,191 (Dep't Commerce Sept. 15, 2009) (final results and final partial rescission of antidumping duty administrative review) ("AR3 Final Results"), and accompanying Issues & Decision Memorandum, A-552-802, ARP 07-08 (Sept. 8, 2009) Cmt. 7 at 33-34 ("AR3 I & D Mem.") (adopted in Final Results, 74 Fed. Reg. at 47,191-92).

Commerce noted in the Final Results, "[t]here is no record evidence as to whether the goods classified as imports from Bangladesh into Bangladesh are re-importations, another category of unspecified imports, or the result of an error in reporting." I & D Mem. Cmt. 6 at 21.  Without a clear explanation of the source or nature of this data, it was reasonable for Commerce to exclude the Bangladesh-to-Bangladesh data as potentially aberrational. See Guangdong Chem. Imp. & Exp. Corp. v. United States, 30 CIT 1412, 1419, 460 F. Supp. 2d 1365, 1370–71 (2006) (finding that lack of information on how data points were chosen for a data set was a reasonable basis for rejecting the data set).

Plaintiffs point to the increased values for factors of production, where Bangladesh-to-Bangladesh data was excluded, and note that by excluding that data only a fraction of total imports remained from which a value could be derived.  However, the Plaintiffs' argument does not provide a basis for finding that the Bangladesh-to-Bangladesh data was reliable or the best available.  The exclusion of the data may have changed the results, but such a change is not, alone, a basis for the court to insist that the data is the best available.  Rather, Plaintiffs' argument assumes that because the resulting values are inconsistent with those generated in prior reviews, inclusion of the Bangladesh-to-Bangladesh data is the best available

information.  Plaintiff's assumption is insufficient to rebut
Commerce's reasoned analysis that, without knowing the nature of
the data, Commerce could not know the value of the data. See
Zhejiang, 652 F.3d at 1342 (finding that plaintiff's assumption
that one data set is correct is not sufficient to challenge
Commerce's choice of the opposing data set).  Furthermore,
Plaintiffs are not now in a position to argue that Commerce
should have further investigated the ComTrade data, when
Plaintiffs could have assumed that responsibility themselves and
placed such further evidence on the record. See QVD Food Co. v.
United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("Although
Commerce has authority to place documents in the administrative
record that it deems relevant, 'the burden of creating an
adequate record lies with [interested parties] and not with
Commerce.'" (alteration in original) (quoting Tianjin Mach. Imp.
& Exp. Corp. v. United States, 16 CIT 931, 936, 806 F. Supp.
1008, 1015 (1992))).

     B.   Calculation of Surrogate Financial Ratios

     After Commerce determines a surrogate value for the factors
of production, there "shall be added an amount for general
expenses and profit plus the cost of containers, coverings, and
other expenses." See 19 U.S.C. § 1677b(c)(1)(B).  These expenses
include factory overhead; selling, general, and administrative
expenses ("SG&A"); and profit.  To value factory overhead, SG&A,

and profit, Commerce uses financial ratios derived from "non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country." 19 C.F.R. § 351.408(c)(4) (2011)[16]; see also I & D Mem. Cmt. 3 at 10.

In this review, Commerce received financial statements for five Bangladeshi companies and determined that only two, Apex Foods Ltd. ("Apex") and Gemini Sea Food Ltd. ("Gemini"), represented "the best available information." I & D Mem. Cmt. 3 at 10.  Defendant-Intervenor AHSTAC challenges both Commerce's rejection of the 2008-2009 financial statement from Fine Foods Ltd. ("Fine Foods") and the classification of loading and unloading expenses listed on Gemini's financial statement. Def.-Intervenor's Mem. Supp. Mot. J. Agency R. 7-17, ECF No. 65 ("Def.-Intervenor's Br.").[17]

Though the two issues will be discussed independently below, the court reviews both determinations on a substantial evidence

---

[16] Unless otherwise noted, all subsequent citations to the Code of Federal Regulations are to the 2011 edition.

[17] AHSTAC also asserts a third argument, contending that Commerce's approach to these two issues was arbitrary – because it inconsistently rejected the Fine Foods financial statement for lack of certainty regarding its status as a shrimp processor but determined that the Gemini loading and unloading expenses were movement expenses on even more uncertain record evidence. Def.-Intervenor's Br. 17-18.  What AHSTAC points out is nothing more than the contextual nature of these determinations.  So long as each decision is made using a reasonable methodology and based on a reasonable reading of the record evidence, the court will not upset the determinations.

standard.  The substantial evidence standard of review "can be
translated roughly to mean 'is [the determination]
unreasonable?'" Nippon Steel Corp. v. United States, 458 F.3d
1345, 1351 (Fed. Cir. 2006) (alteration in original) (quoting
SSIH Equip. SA v. U.S. Int'l Trade Comm'n, 718 F.2d 365, 381
(Fed. Cir. 1983)).  The court will not upset Commerce's decision
simply because alternative inferences or conclusions can be drawn
from the evidence, Daewoo, 6 F.3d at 1520, but only if no
"reasonable mind could conclude that Commerce chose the best
available information," Zhejiang, 652 F.3d at 1341 (quoting
Goldlink, 30 CIT at 619, 431 F. Supp. 2d at 1327)(internal
quotation marks omitted).

     1.   Fine Foods Financial Statement

     Commerce rejected the Fine Foods financial statement as not
the best available information because "[a] careful review of the
Fine Foods financial statement shows that Fine Foods is a farmer
of fish and fish products, and is not a processor of shrimp."
I & D Mem. Cmt. 3.D at 15.  AHSTAC argues that because the Fine
Foods financial statement lists "processing fish" among its main
activities and shrimp among its turnover, the conclusion must be
drawn that Fine Foods processes shrimp. Def.-Intervenor's Br.
9-11; see also Fine Foods Ltd. Annual Report 2009, ¶ 1.3, at 17,
¶ 21 at 26, reprinted in Letter from Pickard Kentz & Rowe LLP to
Secretary of Commerce (Apr. 9, 2010), Admin. R. Pub. Doc. 195,

attach 3 ("Fine Foods Financial Statement").

Even assuming, *arguendo*, that AHSTAC's conclusions may reasonably be drawn from the Fine Foods financial statement, it is equally reasonable to draw the conclusion that Fine Foods does not process shrimp. To arrive at either conclusion, Commerce must have drawn an inference from the record: either shrimp, being listed in turnover alongside fish, are considered fish when Fine Foods states that it "processes fish," or, because Fine Foods does not state that it processes shrimp, shrimp are treated differently from fish. There is nothing definitive in the financial statement to indicate that Fine Foods is or is not a processor of shrimp. Because two alternative inferences could reasonably be drawn from the record, the court defers to Commerce's decision. Daewoo, 6 F.3d at 1520.

In addition, Commerce's rejection of the Fine Foods financial statement does not rest solely on whether Fine Foods processes shrimp. Assuming, *arguendo*, that Fine Foods is a processor of shrimp, it must also be assumed that Fine Foods is a farmer of shrimp – as its financial statement lists production and breeding among its main activities.[18] Therefore, Fine Foods,

_____

[18] Fine Foods' financial statement lists the "main activities of the company" as "[p]roduction of fish, fish product, fish spawn breeding, fingerling growing, production of fish meal & oil, processing fish and marketing the same products in local and foreign market. Plantations of good quality timber trees." Fine Foods Financial Statement ¶ 1.3 at 17. Assuming that "fish" includes shrimp in the phrase "processing fish," it

unlike the mandatory respondents in this review, is vertically

integrated. <u>I & D Mem.</u> Cmt. 3.D at 15.  This is sufficient reason

for Commerce to determine that Fine Foods' "production

experience[] [is] less representative of respondents' production

experience, [as shrimp processors] and therefore, [does] not

represent the best information available for the purpose[] of

calculating surrogate financial ratios." <u>Id.</u>[19]

          2.   Gemini's Loading and Unloading Expenses

     In the <u>Final Results</u>, Commerce found that, "based on the

limited description in Gemini's financial statement, loading and

unloading expenses are best considered as movement expenses and

thus should be excluded from the surrogate financial ratio

calculation." <u>Id.</u> Cmt. 3.A at 11.[20]  AHSTAC challenges Commerce's

finding on two grounds.  First, AHSTAC argues that Commerce's

decision is not supported by substantial evidence on the record.

Second, AHSTAC argues that Commerce has insufficiently explained

its decision.

---

is equally reasonable to assume that "fish" includes shrimp in
the phrases "production of fish" and "fish spawn breeding."

     [19] The court also notes that a straightforward reading of
Fine Foods' financial statement clearly indicates that its basic
character is that of a farm or plantation rather than a shrimp
processor.

     [20] The Department notes that it includes freight expenses in
its dumping calculations for each company, therefore it excludes
similar expenses from the SG&A calculation to avoid double-
counting. <u>Id.</u>

In its first line of argument, AHSTAC contends that the record does not contain substantial evidence supporting Commerce's decision to consider the line item for loading and unloading as movement expenses appropriate for exclusion from the surrogate financial ratio calculation. Def.-Intervenor's Br. 13–14.  Rather, AHSTAC contends that these loading and unloading expenses are related to the movement of goods and materials within "production facilities or warehouses." Id. at 14.

AHSTAC does not, however, provide any compelling evidence supporting its interpretation of the expense in question or establishing that Commerce's conclusion is unreasonable.  Rather, AHSTAC's argument before Commerce and again before this court is only that "the loading and unloading expenses are listed as a line item in the Gemini Financial Statement next to a line item for depreciation support[ing] their classification as SG&A, given that that [sic] Commerce calculates SG&A including line items for depreciation." Id. at 13–14; see AHSTAC Rebuttal Br., Admin. R. Pub. Doc. 209, at 6; see also Gemini Sea Food Ltd. Annual Report 2007–2008 at 29, reprinted in Surrogate Value Memo, exhibit 9 ("Gemini Annual Report").  The court finds no reason, based on the record evidence, to infer from the adjacent placement of these line items any relationship or correlation between them.

Even more importantly, Commerce's determination, based on its expertise and prior practice, is reasonable.  In their Case

Brief to Commerce, the Vietnamese respondents pointed out that the Department excluded loading and unloading expenses from the surrogate financial ratio in the third administrative review of this Order. Vietnamese Resp'ts' Case Br., Admin. R. Pub. Doc. 206, at 12; I & D Mem. Cmt. 3.A. at 11.  Similarly, Commerce noted in the Final Results that its practice is to exclude movement expenses from surrogate financial ratios in order to avoid double-counting. I & D Mem. Cmt. 3.A at 11; see also Fuyao Glass Indus. Grp. v. United States, 27 CIT 1892, 1909 (2003) (remanding to Commerce to demonstrate that valuing water as a separate factor of production did not result in impermissible double-counting).  The Department pointed to a prior review where it had similarly classified "loading and unloading" expenses as movement expenses to be excluded from surrogate financial ratios. I & D Mem. Cmt. 3.A at 11 n.61; Certain Frozen Warmwater Shrimp from India, 74 Fed. Reg. 9,991, 9,995, 9,998 (Dep't Commerce Mar. 9, 2009) (preliminary results and preliminary partial rescission of antidumping duty administrative review) (unchanged in final results).[21]

---

[21] For other examples where Commerce has categorized "loading and unloading" expenses as movement expenses see Certain Frozen Warmwater Shrimp from India, 75 Fed. Reg. 12,175, 12,181, 12,184 (Dep't Commerce Mar. 15, 2010) (preliminary results of antidumping duty administrative review, partial rescission of review, notice of intent to rescind review in part, and notice of intent to revoke order in part); Certain Frozen Warmwater Shrimp from India, 73 Fed. Reg. 12,103, 12,109-10, 12,112 (Dep't Commerce Mar. 6, 2008) (preliminary results and preliminary

This analysis is similar to that affirmed in <u>Hebei Metals & Minerals Imp. & Exp. Corp. v. United States</u>, 29 CIT 288, 366 F. Supp. 2d 1264 (2005).  In <u>Hebei</u>, Commerce determined on remand that "'internal consumption' represented only inter-facility transfers, which would be double-counted if not removed from the expense values in the surrogate ratios' denominators." <u>Id.</u> at 304, 1277.  Though the plaintiffs attacked Commerce's determination as "unsupported speculation," the Court held that Commerce, relying on prior investigations where it deducted internal consumption, drew reasonable inferences from the record. <u>Id.</u> at 304-05, 1278-79.  In this case, Commerce also drew a reasonable inference from the record evidence, using its past experience as a guide, that the loading and unloading expenses in the Gemini financial statement were movement expenses that should be excluded from the surrogate financial ratios to avoid impermissible double-counting.

As noted above, AHSTAC argues that Commerce insufficiently explained its decision to exclude loading and unloading expenses

---

partial rescission of antidumping duty administrative review); <u>Structural Steel Beams from Korea</u>, 69 Fed. Reg. 53,887, 53,889 (Dep't Commerce Sept. 3, 2004) (preliminary results of antidumping duty administrative review); <u>Structural Steel Beams from the Republic of Korea</u>, 68 Fed. Reg. 53,129, 53,131-32 (Dep't Commerce Sept. 9, 2003) (preliminary results of antidumping duty administrative review); <u>Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China</u>, 61 Fed. Reg. 15,028, 15,033 (Dep't Commerce Apr. 4, 1996) (final results of antidumping administrative review).

from the surrogate financial ratios, contending that "Commerce

merely referenced the 'limited description' of these expenses and

thereafter stated its general approach to calculating surrogate

financial ratios." Def.-Intervenor's Br. 15.  However, AHSTAC

ignores the discussion in the <u>Final Results</u> of Commerce's policy

of avoiding double-counting and its belief, based on prior

experience, that loading and unloading expenses are best

classified as movement expenses to avoid such double-counting.

Though Commerce's discussion may not be as thorough as AHSTAC

would like, the agency's "decisional path is discernable," and a

more "explicit explanation . . . is not necessary." <u>AL Tech</u>

<u>Specialty Steel Corp. v. United States</u>, 28 CIT 1468, 1489 (2004)

(citing <u>Wheatland Tube Co. v. United States</u>, 161 F.3d 1365,

1369–70 (Fed. Cir. 1998) (internal quotation marks omitted)).

    *C.   Multi-country Averaging for Surrogate Labor Wage Data*

    As noted above, when valuing most factors of production

Commerce analyzes data from a single market economy country. <u>See</u>

19 C.F.R. § 351.408(c)(2); <u>Dorbest Ltd. v. United States</u>, 604

F.3d 1363, 1367–68 (Fed. Cir. 2010).  Until recently, Commerce

valued surrogate labor wage rates differently, using regression

analysis to determine wage rates based on "the observed

relationship between wages and national income in market economy

countries." <u>See</u> § 351.408(c)(3); <u>Dorbest</u>, 604 F.3d at 1368.

However, in <u>Dorbest</u>, the Federal Circuit invalidated

§ 351.408(c)(3), holding that the regulation did not comply with

19 U.S.C. § 1677b(c)(4) which requires use of data from

economically comparable countries that are significant producers

of comparable merchandise. Dorbest, 604 F.3d at 1372 ("[19 C.F.R.

§ 351.408(c)(3)] improperly requires using data from both

economically comparable and economically dissimilar countries,

and it improperly uses data from both countries that produce

comparable merchandise and countries that do not.").

    Dorbest was decided on May 14, 2010, following the

Preliminary Results but prior to the Final Results in the fourth

administrative review at issue here.  In light of the decision of

the Court of Appeals in Dorbest, Commerce sought comments from

interested parties on a new methodology for calculating surrogate

wage rates in the instant review. Final Results, 75 Fed. Reg. at

47,772.  After considering the comments, Commerce decided to

value surrogate wage rates "by averaging earnings and/or wages in

countries that are economically comparable to Vietnam and that

are significant producers of comparable merchandise." Id.; see

also I & D Mem. Cmt. 9 at 27-31.  Among the methodologies

Commerce rejected was a proposal by the Vietnamese respondents to

"value labor using wage data specific to the shrimp processing

industry in Bangladesh taken from the Bangladesh Bureau of

Statistics' 2007 Wage Survey." I & D Mem. Cmt. 9 at 26.

    Plaintiffs now contend that it was error for Commerce to use

an averaging methodology that uses data from multiple countries,

rather than using the industry specific data on shrimp processing

wages in Bangladesh, the surrogate country used in valuing other

factors of production. Pls.' Br. 27.  Plaintiffs argue that the

Bangladesh data is the "best available information," because it

is the most industry specific data on the record, and that such

specific data is required by the statute and relevant case law.

Id. at 31–33.  Commerce maintains that it has broad discretion to

determine what is the best available information, and that its

decision – that "reliance on wage data from a single country [is]

unreliable and arbitrary" – is a reasonable determination. I & D

Mem. Cmt. 9 at 27.

These competing positions require the court to decide

whether the only reasonable interpretation of the statute is that

industry specificity trumps other concerns when considering what

constitutes best available information under 19 U.S.C. § 1677b.

The court answers this question in the negative.

First, the plain language of the statute does not require

that the best available information include industry specific

information when such is available.

> The best available information concerning the valuation
> of a particular factor of production may constitute
> information from the surrogate country that is directly
> analogous to the production experience of the NME
> producer . . . or it may not. . . . Commerce need not
> duplicate the exact production experience of the [NME]
> manufacturers at the expense of choosing a surrogate
> value that most accurately represents the fair market

value . . . .

See Nation Ford, 166 F.3d at 1377 (citation omitted) (internal
quotation marks omitted).

While § 1677b(c)(3) directs Commerce to obtain values for
the "factors of production utilized in producing [the subject]
merchandise," § 1677b(c)(4) specifies that these values are, "to
the extent possible," to come from "market economy countries that
are significant producers of comparable merchandise."  Assuming
that by using the phrase "comparable merchandise," Congress
intended Commerce to consider factors of production for
industries in the surrogate country or countries as similar as
possible to those in the NME, it unduly strains the language to
hold that specificity is the sole touchstone of the analysis, to
the exclusion of such factors as data stability and reliability.

Second, contrary to Plaintiffs' assertion, the legacy of
Dorbest and this Court's decision in Allied Pac. Food (Dalian)
Co. v. United States, __ CIT __, 587 F. Supp. 2d 1330 (2008), is
neither that "the statute contains no exception for how the labor
factor of production should be selected," nor that "the pursuit
of the best available information requires Commerce to apply to
the selection of labor surrogate values the same selection
criteria it applies when selecting other surrogate values." Pls.'
Br. 32.  Plaintiffs read both decisions too narrowly and would
constrain Commerce in an area where the Department has broad

discretion. See Nation Ford, 166 F.3d at 1377.  Contrary to
Plaintiffs' reading, in Dorbest and Allied Pac., the Court of
Appeals and this Court, respectively, held specifically that 19
C.F.R. § 351.408(c)(3) was contrary to 19 U.S.C. § 1677b(c)(4)
because it required the use of data that was prohibited by the
statute. Dorbest, 604 F.3d at 1372; Allied Pac., __ CIT at __,
587 F. Supp. 2d at 1357-61.

    Dorbest held that, pursuant to § 1677b(c)(4), Commerce's
regulation employing regression analysis was overbroad because it
included non-comparable countries. Dorbest, 604 F.3d at 1372-73.
Dorbest did not hold that the regulation lacked industry
specificity, nor did it discuss the idea of industry specificity.
Id. at 1371-72.  By invalidating § 351.408(c)(3), Dorbest
required that any new methodology must comport with the statute
by limiting itself to countries that were of comparable economic
development *and* significant producers of comparable merchandise.
Id.

    In Allied Pac., this Court did endorse the use of industry
specific data.[22] Allied Pac., 587 F. Supp. 2d at 1357-58.

_____

    [22] The Court noted that "[l]egislative history supports the
principle that Congress intended Commerce to use, where possible,
information on the cost of the specific labor used to produce the
subject merchandise." Allied Pac., 587 F. Supp. 2d at 1357.  The
Court then went on to give the following example:

    It is at least conceivable that a party to a proceeding
    might obtain, from one or more countries that are
    economically comparable to China and are significant

However, it stopped short of holding that such data is required
by § 1677b(c)(4).  Rather, <u>Allied Pac.</u> held that Commerce's
regression-based regulation, which prohibited Commerce from even
considering such industry-specific data, could not withstand
judicial scrutiny in light of the plain language of the statute.
<u>Id.</u> at 1357, 1361.  Thus, in light of <u>Dorbest</u> and <u>Allied Pac.</u>, so
long as all the data on the record is limited to countries
meeting the § 1677b(c)(4) criteria and the record is not
foreclosed to any data meeting that criteria, Commerce retains
the discretion to consider all of the data on the record and
determine what constitutes the best available information.

     Third, Commerce's preference for industry-specific data does
not necessarily outweigh its preference for labor data from
multiple countries.  Plaintiffs correctly note that Commerce has
expressed a preference for industry-specific data. <u>See</u> Pls.' Br.
29-30.  However, Commerce also has a long-standing policy of
favoring data from multiple countries when calculating surrogate
wage rates. <u>I & D Mem.</u> Cmt. 9 at 28 ("[T]he Department maintains

─────────────────

          producers of merchandise comparable to the subject
          merchandise, information on wage rates in the specific
          industry that produces the comparable merchandise or on
          wage rates for the specific type of labor used.  Such
          information would seem to be ideal, according to the
          statutory criteria of 19 U.S.C. § 1677(b)(c)(1) and
          (c)(4), for the purpose of valuing the hours of labor
          required to produce the subject merchandise.

<u>Id.</u> at 1358.

its longstanding position that, even when not employing a

regression methodology, more data are still better than less data

for purposes of valuing labor."). Commerce, in this case, chose

to use data from multiple countries over industry-specific data

because it believed that this led to more accurate values. Def.'s

Resp. Br. 34.  Such a result is not inconsistent with Commerce's

stated policies.

It follows that the language of the statute, the relevant

case law, and the agency's established methodologies do not

support the proposition that a predominating preference for

industry-specificity is the only reasonable interpretation of the

statute. See Shandong Rongxin Imp. & Exp. Co. v. United States,

__ CIT __, 774 F. Supp. 2d 1307, 1314 (2011).  Furthermore,

Commerce's decision on this issue was reasonable.  The court

accepts, as does Commerce, that industry-specificity may add

accuracy to data used to calculate surrogate values.  However,

Commerce has also repeatedly pointed out the discrepancies that

exist between wages and gross national income ("GNI"), noting in

the Final Results that:

> [f]or example, when examining the most recent wage
> data, even for countries that are relatively comparable
> to Vietnam in terms of GNI for purposes of factor
> valuation . . . the wage rate spans from USD 0.49 to
> USD 1.30. . . . There are many socio-economic,
> political and institutional factors, such as labor laws
> and policies unrelated to the size or strength of an
> economy, that cause significant variances in wage
> levels between countries.

I & D Mem. Cmt. 9 at 27-28.

In this case, Commerce had industry-specific data for one country, Bangladesh. Id. at 24-27. With industry-specific data for only one country, Commerce was faced with making a choice between specificity and accounting for wage rate variance by averaging data from as many countries as possible. It chose the latter. A reasonable mind could determine that Commerce chose the best available information, see Zhejiang, 652 F.3d at 1341; see also Shandong, __ CIT at __, 774 F. Supp. 2d at 1314, and the court will not upset Commerce's reasonable choice. Zhejiang, 652 F.3d at 1341.

Finally, the court does not find, as Plaintiffs suggest in their reply brief, that Commerce's subsequent decision – to use, in future reviews, wage rate data from a single surrogate country – is a basis for finding unreasonable the decision to use multi-country averaging in this review. Pls.' Reply Mem. Supp. Mot. J. Agency R. 7-8, ECF No. 95 ("Pls.' Reply Br."). The court recognizes that, going forward, Commerce has adopted a policy similar to that advocated by Plaintiffs in this review. See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg. 36,092, 36,094 (Dep't Commerce June 21, 2011) ("Labor Valuation Methodology") ("Pursuant to the comments received and the Department's analysis thereof, the Department will value the NME

respondent's labor input using industry-specific labor costs
prevailing in the primary surrogate country, as reported in
Chapter 6A of the ILO Yearbook of Labor Statistics.").  However,
this policy change was issued almost eleven months after the
Final Results in the fourth administrative review.[23]

     Furthermore, Commerce's decision to move away from multi-
country averaging was premised, in large part, on the intervening
decision in Shandong, where this Court held that because 19
U.S.C. § 1677b(c)(4) requires that surrogate countries be
significant producers of comparable merchandise, Commerce could
not use data including countries which "almost certainly have no
domestic production." Shandong, __ CIT at __, 774 F. Supp. 2d at
1316.[24]  In light of the Court's holding in Shandong, Commerce
found that "the base for an average wage calculation would be so
limited that there would be little, if any, benefit to relying on
an average of wages from multiple countries for purposes of

---

     [23] The new policy, itself, cannot control in this case
because it is not retroactive. See Labor Valuation Methodology,
76 Fed. Reg. at 36,093 (applying new methodology to antidumping
proceedings "initiated on or after the date of publication of
this Federal Register notice"); see also Dorbest Ltd. v. United
States, __ CIT __, 789 F. Supp. 2d 1364, 1369 n.9 (2011) ("While
Dorbest urges the court to hold that Commerce's current
methodology is unlawful when considered in light of Commerce's
recent announcement [valuing labor using a single surrogate
country], the court cannot do so because Commerce's change in
methodology is not retroactive.").

     [24] No party claims that the data relied on here was
inconsistent with Shandong.

minimizing the variability that occurs in wages across

countries." <u>Labor Valuation Methodology</u>, 76 Fed. Reg. 36,093.

Because the circumstances at the time of the fourth

administrative review were not the same as those that led

Commerce to change its labor valuation methodology, the court

will not hold Commerce's earlier decision unreasonable.

III. <u>Commerce's Denial of Grobest's Revocation Request</u>

        Plaintiff Grobest contends that Commerce improperly denied

its request for revocation on the grounds that it was not

reviewed as a mandatory respondent.[25]  Grobest makes three

primary arguments supporting its claim for revocation review.

First, Grobest asserts that 19 U.S.C. § 1677f-1(c)(2), which

permits Commerce to limit the number of companies it reviews,

does not apply in the context of a request for revocation. Pls.'

Br. 43-46.  Second, Grobest asserts that Commerce should have

applied the procedure articulated in <u>Certain Fresh Cut Flowers</u>

---

        [25] In the Respondent Selection Memorandum for the fourth
administrative review, Commerce, pursuant to 19 U.S.C.
§ 1677f-1(c)(2)(B), limited the number of mandatory respondents
selected for review to the two largest companies by import
volume. Memorandum from Scot T. Fullerton, Program Manager, to
John M. Andersen, Acting Deputy Assistant Secretary for
Antidumping and Countervailing Duty Operations 1-4 (June 11,
2009), Admin. R. Pub. Doc. 89 ("Resp't Selection Mem.").  The
companies selected as mandatory respondents were Minh Phu and Nha
Trang. <u>Id.</u> at 7.  The Department received 143 requests for
review, of which eighteen respondents also requested revocation.
<u>Id.</u> at 1.  Twelve respondents subsequently withdrew their
revocation requests but maintained their requests for review. <u>Id.</u>
at 1-2.

from Colombia ("Flowers") in this review.[26] Pls.' Br. 37-43.

Third, Grobest asserts that Commerce should have reviewed it as a

voluntary respondent in accordance with 19 U.S.C. § 1677m(a).

Pls.' Br. 46-47.

Grobest's first and second arguments are addressed by the

Court's recent decision in Amanda Foods (Vietnam) Ltd. v. United

States, 35 CIT __, Slip Op. 11-155 (Dec. 14, 2011), which

reviewed the third administrative review of this Order.  The

third issue, Grobest's request for voluntary respondent status,

was not addressed in Amanda Foods because the plaintiff in that

case did not seek voluntary respondent status. Id. at 28.

Regarding Grobest's first argument, the court notes, as

discussed at length in Amanda Foods, that neither the statutes

nor the regulations relevant to administrative review and

revocation of antidumping duty orders require the Department to

initiate an individual review upon request for revocation. See

Id. at 21-22.  In Amanda Foods, the Court held reasonable

Commerce's interpretation of 19 U.S.C. § 1675(d)(1), which

requires an individual review under § 1675(a) or (b) (i.e., in an

administrative review or a changed circumstances review) as a

prerequisite to revocation. Id. at 13-18.  It follows, that it is

---

[26] Certain Fresh Cut Flowers from Colombia, 62 Fed. Reg. 53,287, 53,290-91 (Dep't Commerce Oct. 14, 1997) (final results and partial rescission of antidumping duty administrative review) ("Flowers Final Results").

also a reasonable interpretation of the statute for Commerce to

conclude that when the number of respondents is limited under

§ 1677f-1(c)(2) for the purpose of review, respondents who are

not selected for individual review, whether mandatory or

voluntary, are ineligible for revocation. Id. Furthermore, it is

reasonable for the Department to interpret its regulations, found

at 19 C.F.R. § 351.222, as procedures for conducting a revocation

when a respondent has been selected for individual review. Id. at

18-22. This interpretation is consistent with both the

regulatory language and the statutory structure. Id. Because

neither 19 U.S.C. § 1675(d) nor 19 C.F.R. § 351.222 requires a

separate review for the purposes of revocation, the court finds

Grobest's appeal to these provisions unavailing.

The court also finds Grobest's second argument, that

Commerce should have applied the Flowers procedure, unavailing.

As the court articulated in Amanda Foods, the procedure announced

in Flowers is not binding on Commerce. Id. at 27-28. The Flowers

procedure was never implemented in practice, nor has Commerce

subsequently relied upon this procedure to govern a review. Id.

Furthermore, Commerce has "in practice, changed its policy to

rely instead on the voluntary review process in order to achieve

the objectives stated in Flowers . . . ." Id. Given this

history, the court finds that the Flowers procedure is not a

precedential agency policy.

Thus, the court turns to Grobest's third argument, which was not considered in <u>Amanda Foods</u>.  Grobest argues that it should have been reviewed as a voluntary respondent, pursuant to 19 U.S.C. § 1677m(a),[27] because (1) Commerce limited the number of companies individually examined under § 1677f-1(c)(2); (2) Grobest complied with the statutory requirements for voluntary respondent status; and (3) the number of companies seeking voluntary respondent status, two, would not have been unduly burdensome to review. Pls.' Br. 46-47.  Commerce maintains that considering companies as voluntary respondents is discretionary, and that because it determined under § 1677f-1(c)(2) that it could only review two mandatory respondents, reviewing any voluntary respondents would have been unduly burdensome. Def.'s

---

[27] Section 1677m(a) reads in relevant part:

In . . . a review under section 1675(a) of this title in which the administering authority has, under section 1677f-1(c)(2) of this title . . . limited the number of exporters or producers examined . . . [Commerce] shall establish . . . an individual weighted average dumping margin for any exporter or producer not initially selected for individual examination . . . who submits to the administering authority the information requested from exporters or producers selected for examination, if (1) such information is so submitted by the date specified (A) for exporters and producers that were initially selected for examination . . . and (2) the number of exporters or producers who have submitted such information is not so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation.

Resp. Br. 18-21.

Commerce's determination fails to comply with § 1677m(a), which requires that Commerce separately determine whether reviewing the voluntary respondents "would be unduly burdensome and inhibit the timely completion of the investigation." Commerce's determination is, therefore, an unreasonable interpretation of the statute because it violates the well-established principle that, where possible, the court should give effect to all parts of the statute. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." (citations omitted)(internal quotation marks omitted)).[28]

Contrary to this principle of statutory construction, Commerce's interpretation of § 1677m(a) renders that provision meaningless.  Commerce argues that when it limits the number of mandatory respondents under § 1677f-1(c)(2), it need not consider any voluntary respondents under § 1677m(a) because it has already determined the number of respondents that it can review (in this case two). Def.'s Resp. Br. 18.  But this argument conflates the two statutory provisions and renders § 1677m(a) a dead letter.

_____

[28] More generally, following step one of the familiar Chevron analysis, the court employs the traditional tools of statutory construction to determine whether Congress has spoken directly to the issue. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 n.9 (1984).

Though § 1677m(a) is written to have effect only when Commerce

"has, under 1677f-1(c)(2) . . . limited the number of exporters

or producers examined," Commerce's interpretation would mean that

§ 1677m(a) review of voluntary respondents is already curtailed

once a § 1677f-1(c)(2) decision to limit the number of

respondents is made.[29]

---

[29] Commerce also argues that the purpose of § 1677m(a) is to permit voluntary respondents to fill vacancies created when one or more mandatory respondents are not reviewed. See, e.g., Calgon Carbon Corp. v. United States, 35 CIT __, Slip Op. 11-21 (Feb. 17, 2011) (reviewing voluntary respondent where mandatory respondent refused to participate).  Commerce further contends that, because a mandatory respondent could exit the review process opening a spot for voluntary respondents, using § 1677f-1(c)(2) to limit the number of respondents generally does not foreclose the opportunity for voluntary respondents to obtain review.  Rather, according to Commerce, it only forecloses the opportunity for voluntary respondents when it declares, at the outset, that it will not consider *any* voluntary respondents. See, e.g., Zhejiang Native Produce & Animbal By-Products Imp. & Exp. Corp. v. United States, __ CIT __, 637 F. Supp. 2d 1260 (2011).
     The court finds this interpretation of the statute unreasonable.  Such an interpretation fails to address the bifurcated nature of the two statutory provisions at issue, §§ 1677f-1(c)(2) and 1677m(a), as discussed above.  Furthermore, such an interpretation surely discourages voluntary respondents because it confines the opportunity for voluntary respondent review to the irregular situation where a mandatory respondent is not reviewed.  Such discouragement is contrary to the expressed intent of Congress, which noted in the Statement of Administrative Action for the Uruguay Round Agreements Act that "Commerce, consistent with Article 6.10.2 of the Agreement will not discourage voluntary responses and will endeavor to investigate all firms that voluntarily provide timely responses in the form required . . . ." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201.  To limit voluntary respondents through § 1677f-1(c)(2) is to foreclose the review under § 1677m(a) barring the unexpected and irregular.

Furthermore, Commerce has misread the statute.  According to Commerce, under § 1677m(a), "if Commerce limits the number of respondents it individually reviews, it *may* still consider voluntary respondents who request review only if 'the number of exporters or producers who have submitted such information is not so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation.'" Def.'s Resp. Br. 18 (emphasis added) (quoting 19 U.S.C. § 1677m(a)).  However, the language of the statute states:

> [Commerce] *shall establish* . . . an individual weighted
> average dumping margin for any exporter or producer not
> initially selected for individual examination . . .
> [if] the number of exporters or producers who have
> submitted such information is not so large that
> individual examination of such exporters or producers
> would be unduly burdensome and inhibit the timely
> completion of the investigation.

19 U.S.C. § 1677m(a)(emphasis added).  Contrary to Commerce's view that the statute contains a discretionary grant of authority to review voluntary respondents if such review is practical, the statute plainly requires Commerce to conduct individual reviews unless such reviews would be unduly burdensome and inhibit the timely completion of the investigation.

Finally, Commerce ignores the separate standards set out in §§ 1677f-1(c)(2) and 1677m(a). Where § 1677f-1(c)(2) permits Commerce to limit the number of mandatory respondents "[i]f it is not practicable to make individual weighted average dumping

margin determinations," § 1677m(a) sets a higher standard,
requiring review of voluntary respondents unless such review
"would be unduly burdensome and inhibit the timely completion of
the investigation."  The two, distinct standards call for
separate determinations, and the latter determination, pursuant
to § 1677m(a), sets a higher threshold of agency burden before
the requirement of individual review can be avoided.

        Arguing to the contrary, Commerce relies on this Court's
opinion in Longkou Haimeng Mach. Co. v. United States, __ CIT __,
581 F. Supp. 2d 1344 (2008), for the proposition that Commerce
may choose not to review voluntary respondents once it has
limited the number of mandatory respondents it will review.
Def.'s Resp. Br. 20.  Commerce is correct that in Longkou the
Court held that Commerce has exclusive authority to limit the
number of respondents it examines, and that it may limit the
number of respondents solely to mandatory respondents. Longkou,
__ CIT at __, 581 F. Supp. 2d at 1352.  In other words, Commerce
is not absolutely required to review voluntary respondents, as
the exception clause at § 1677m(a)(2) makes clear.  However,
Longkou does not stand for the proposition that Commerce's
determination under § 1677f-1(c)(2) is effective in determining
whether it will review voluntary respondents.  That question was

not reached in <u>Longkou</u>.[30]

Thus, the court finds that Congress has spoken directly to the issue of whether Commerce's determination under § 1677f-1(c)(2) controls its decision to review voluntary respondents under § 1677m(a). <u>See</u> <u>Chevron</u>, 467 U.S. at 842-43. Congress intended for respondents to have the opportunity to seek voluntary respondent status, without having such efforts foreclosed by the Department's determination under § 1677f-1(c)(2), the very decision that initiates the § 1677m(a) process. Thus, in order for § 1677m(a) to be meaningful, it must be read as requiring Commerce to make an independent determination of whether it can review the voluntary respondents without such review being unduly burdensome and inhibiting the timely completion of the investigation.

For these reasons, Commerce's determination will be remanded.

--------

[30] The court acknowledges that the <u>Longkou</u> opinion states that "[t]he provisions in sections 1677m(a) and 1677f-1(c)(2) are clear expressions of Commerce's statutory authority to limit the number of respondents it chooses to review." <u>Longkou</u>, __ CIT at __, 581 F. Supp. 2d at 1351. This statement is consistent with today's opinion. The court affirms its prior position that Commerce has exclusive authority to limit the number of respondents it will review, <u>id.</u> at 1352, but such determinations must be made consistent with statutory guidelines, and the court holds today that § 1677m(a) requires an independent determination of whether reviewing the voluntary respondents would be unduly burdensome and inhibit the timely completion of the investigation.

IV.  <u>Commerce's Rejection of Amanda Foods' Separate Rate
     Certification</u>

In antidumping proceedings concerning NME countries, such as
Vietnam, Commerce presumes that all exporters and producers in
the country are subject to government control unless the exporter
or producer rebuts this presumption by showing *de jure* and *de
facto* independence from government control.  <u>See</u> <u>Amanda Foods
(Vietnam) Ltd. v. United States</u>, __ CIT __, 647 F. Supp. 2d 1368,
1374 n.9 (2009) (citation omitted).[31]  Exporters or producers
demonstrating such independence receive separate-rate status.  If
an exporter or producer received a separate rate in a prior
review and has not undergone relevant changes, it may submit a
separate-rate certification ("SRC") to maintain separate-rate
status in subsequent reviews.  <u>Preliminary Results</u>, 75 Fed. Reg.
at 12,210 n.6.  All other companies seeking separate-rate status
must file a separate-rate application ("SRA").  <u>Id.</u>

Amanda Foods received separate-rate status based on its SRA
in the initial investigation,[32] and retained its separate rate in

_____

[31] An exporter or producer that can rebut the presumption of
government control will receive a separate rate; all other
exporters and producers receive the country-wide rate.
<u>Preliminary Results</u>, 75 Fed. Reg. at 12,210.

[32] <u>Certain Frozen and Canned Warmwater Shrimp from the
Socialist Republic of Vietnam</u>, 69 Fed. Reg. 71,005, 71,009 (Dep't
Commerce Dec. 8, 2004) (final determination of sales at less than
fair value) ("<u>Investigation Results</u>").

all subsequent reviews prior to the fourth by filing an SRC.[33]

In this fourth administrative review, Amanda Foods filed its SRC

on July 31, 2009, ninety-five days after the deadline, Amanda

Foods' Separate Rate Certification, Admin. R. Pub. Doc. 109, but

more than seven months before the <u>Preliminary Results</u>.  Shortly

after filing the SRC, Amanda Foods sent a letter to Commerce

requesting that the Department accept its late-filed submission.

Letter from Mayer Brown to Secretary of Commerce (Aug. 4, 2009),

Admin R. Pub. Doc. 115.  On August 7, 2009, Commerce rejected

Amanda Foods' SRC as untimely under 19 C.F.R. § 351.302(d)(2).[34]

Letter from Scot Fullerton, Program Manager, to Amanda Foods

(Aug. 7, 2009), Admin. R. Pub. Doc. 117.  Amanda Foods

resubmitted the SRC on August 12, 2009 requesting

reconsideration. Letter from Mayer Brown to Secretary of Commerce

(Aug. 12, 2009), Admin. R. Pub. Doc. 118.  However, in the

<u>Preliminary Results</u> Commerce maintained that it would not

---

[33] <u>Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam</u>, 71 Fed. Reg. 42,628, 42,629 (Dep't Commerce
July 27, 2006) (partial rescission of the first administrative
review) (assigning respondents prior rate following rescission of
review); <u>Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam</u>, 73 Fed. Reg. 52,273, 52,274 n.3 (Dep't
Commerce Sept. 9, 2008) (final results and final partial
rescission of antidumping duty administrative review) ("<u>AR2 Final
Results</u>"); <u>AR3 Final Results</u>, 74 Fed. Reg. at 47,194 n.9.

[34] 19 C.F.R. § 351.302(d)(2) states that "[Commerce] will
reject such [untimely filed] information, argument, or other
material, or unsolicited questionnaire response with, to the
extent practicable, written notice stating the reasons for
rejection."

consider Amanda Foods' SRC because it was untimely filed and
preliminarily assigned Amanda Foods the Vietnam-wide rate.
Preliminary Results, 75 Fed. Reg. at 12,210.  Commerce maintained
this position in the final results, assigning Amanda Foods the
Vietnam-wide rate of 25.76%. Final Results, 75 Fed. Reg. at
47,776 n.16; I & D Mem. Cmt. 11 at 35-36.

    The law applicable to this issue recognizes that Commerce
has discretion both to set deadlines and to enforce those
deadlines by rejecting untimely filings. See NTN Bearing Corp. v.
United States, 74 F.3d 1204, 1206-07 (Fed. Cir. 1995); see also
Yantai Timken Co. v. United States, 31 CIT 1741, 1755, 521 F.
Supp. 2d 1356, 1371 (2007) ("In order for Commerce to fulfill its
mandate to administer the antidumping duty law, including its
obligation to calculate accurate dumping margins, it must be
permitted to enforce the time frame provided in its
regulations.").  However, Commerce's discretion in this regard is
not absolute. NTN Bearings, 74 F.3d at 1207 ("[A] regulation
which is not required by statute may, in appropriate
circumstances, be waived and must be waived where failure to do
so would amount to an abuse of discretion."); see also Fischer
S.A. Comercio, Industria and Agricultura v. United States, __ CIT
__, 700 F. Supp. 2d 1364, 1375-77 (2010).

    When considering whether Commerce's rejection of an untimely
filing amounts to an abuse of discretion, the court is guided

first by the remedial, and not punitive, purpose of the

antidumping statute, Chaparral Steel Co. v. United States, 901

F.2d 1097, 1103-04 (Fed. Cir. 1990), and the statute's goal of

determining margins "as accurately as possible," Rhone Poulenc,

Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  The

court also weighs "the burden imposed upon the agency by

accepting the late submission," Usinor Sacilor v. United States,

18 CIT 1155, 1164, 872 F. Supp. 2d 1000, 1008 (1994), and "the

need for finality at the final results stage," Timken U.S. Corp.

v. United States, 434 F.3d 1345, 1353 (Fed. Cir. 2006).  Thus,

while deferring to Commerce's necessary discretion to set and

enforce its deadlines, the court will review on a case-by-case

basis whether the interests of accuracy and fairness outweigh the

burden placed on the Department and the interest in finality.

    The court's analysis of this issue is necessarily case

specific.  On the facts of this case, Commerce abused its

discretion by refusing to accept Amanda Foods' late-filed SRC.

The Vietnam-wide rate of 25.76% assigned to Amanda Foods, Final

Results, 75 Fed. Reg. at 47,776 n.16, stands in stark contrast to

the 4.27% rate assigned to the separate-rate respondents, id. at

47,774-75, which was later revised down to 3.92% in the Amended

Final Results, 75 Fed. Reg. at 61,123-25.  In both the second and

third reviews, Commerce noted that "because [Amanda Foods] is

wholly foreign-owned, and we have no evidence indicating that its

export activities are under the control of the Vietnamese
government, a separate rates analysis is not necessary to
determine whether this company is independent from government
control."[35]   In the SRC that was rejected in the fourth
administrative review, Amanda Foods again indicated that it was
wholly owned by foreign entities located in a market economy
country, Singapore. Amanda Foods' Separate Rate Certification 2.
Amanda Foods received separate-rate status in the initial
investigation and has maintained that status in each subsequent
review prior to the fourth due to it being wholly foreign-owned;
thus, it appears likely that, but for the untimeliness of its
submission, Amanda Foods would have received a separate rate in
the fourth administrative review, as it remains wholly foreign-
owned.  Therefore, Commerce's rejection of Amanda Foods'
submission as untimely appears to have worked a substantial
hardship upon that company and resulted in an inaccurate dumping
margin.[36]  This conclusion, however, is only the first step in

---

[35] Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam, 73 Fed. Reg. 12,127, 12,132 (Dep't Commerce
Mar. 6, 2008) (preliminary results, preliminary partial
rescission and final partial rescission of the second
administrative review) ("AR2 Preliminary Results"); see also
Certain Frozen Warmwater Shrimp from the Socialist Republic of
Vietnam, 74 Fed. Reg. 10,009, 10,013 (Dep't Commerce Mar. 9,
2009) (preliminary results, preliminary partial rescission and
request for revocation, in part, of the third administrative
review) ("AR3 Preliminary Results").

[36] The court notes that the Vietnam-wide rate of 25.76% is
over six times greater than the rate of 3.92% assigned to the

the analysis.

     As noted above, the court must weigh the interests in
accuracy and fairness against the burden placed on the
Department.  Amanda Foods argues at length that consideration of
SRCs is not a burdensome process.

> [Commerce's] stated justification of needing early
> submission of SRCs in order to have sufficient time to
> pursue questions that may arise and provide
> opportunities to comment on the submitted information
> is undermined by the fact that [Commerce's]
> consideration of SRCs has always been minimal and not
> time-consuming.  By design, the SRC was structured to
> limit the amount of information that respondents had to
> submit and that [Commerce] had to review.

Consol. Pl.'s Mem. Supp. Mot. J. Agency R. 17, ECF No. 63
("Consol. Pl.'s Br.").  Commerce responds that Amanda Foods'
argument is entirely speculative regarding how Commerce would
react to the SRC.  "Commerce cannot speculate about how it would
have reacted to the information in the certification because
Commerce rejected it as untimely.  Thus, Amanda Foods' arguments
that Commerce would not have spent much time reviewing the
certification fail because they depend upon the substance of the
untimely certification Commerce rejected." Def.'s Resp. Br. 41.

     The court must reject both lines of argument as overbroad.
The court cannot, as Amanda Foods' suggests, assume that the
consideration of an SRC is perfunctory.  The court acknowledges

---

separate-rate respondents in the Amended Final Results, 75 Fed.
Reg. at 61,123-25.

that consideration of an SRC may require further inquiry and
investigation of the respondent by Commerce.  However, contrary
to Commerce's reasoning, a wholly hypothetical burden does not
carry compelling weight.  While it is not the court's place to
determine whether further inquiry into Amanda Foods' SRC is
necessary, every indication suggests that the burden of reviewing
the SRC would not be great.  Commerce has not conducted a
separate-rate analysis in response to any of Amanda Foods' prior
SRCs. See AR2 Preliminary Results, 73 Fed. Reg. at 12,132; AR3
Preliminary Results, 74 Fed. Reg. at 10,013.  Nor did Commerce
conduct any further questioning of the other separate-rate
respondents in this review, whether they submitted SRCs or SRAs.
Preliminary Results, 75 Fed. Reg. at 12,210–11.  Furthermore, the
court is not convinced that if further investigation of Amanda
Foods' SRC were necessary, the burden on Commerce would be
sufficient to outweigh the interests in fairness and accuracy.[37]
While the court acknowledges, both generally and in this case,
that Commerce's resources are limited, the burden on Commerce is
not sufficient in this case.  This is because the court finds two
further considerations weigh in favor of accepting Amanda Foods'
late-filed SRC.

     First, though the submission was ninety-five days late, it

---

[37] The court notes that of the twenty-nine SRCs or SRAs
submitted in this review, only Amanda Foods' was submitted late.

arrived early in the review process: more than seven months

before Commerce released the preliminary results[38] and one year

before Commerce released the final results.  Thus, there is no

concern with finality in this case. <u>Timken</u>, 434 F.3d at 1353-54.

Second, Amanda Foods was diligent in seeking to correct the

omission of its SRC, promptly filing its late submission as soon

as it discovered the omission. <u>See</u> Letter from Mayer Brown to

Secretary of Commerce (Aug. 4, 2009), Admin. R. Pub. Doc. 115,

at 3.  Though late, Amanda Foods filed its SRC early in the

review and promptly upon discovering its error, and the court

credits these efforts to cooperate in the review and to maintain

the accuracy of the dumping margins.

The court therefore finds that in this case: (1) the margin

assigned to Amanda Foods was likely inaccurate and

disproportionate; (2) Amanda Foods was diligent in correcting its

submission; (3) Amanda Foods' submission was early enough in the

proceeding to minimize concerns for finality; and (4) the burden

on Commerce in considering the late-filed SRC would likely be

minimal given that only one SRC was filed late, the late-filed

SRC appears to maintain the status quo, and no follow-up was

---

[38] When Amanda submitted its SRC, the <u>Preliminary Results</u>
were due in three months' time, on October 31, 2009; however, on
October 27, 2009, Commerce extended the filing deadline until
March 1, 2010. <u>Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam and the People's Republic of China</u>, 74 Fed.
Reg. 55,192, 55,192 (Dep't Commerce Oct. 27, 2009) (extension of
preliminary results of antidumping administrative reviews).

conducted with regard to other separate-rate requests.  In light

of these findings, the court holds that in this case, the

interests in fairness and accuracy outweigh the burden upon

Commerce; therefore, Commerce's rejection of Amanda Foods' late-

filed submission was an abuse of discretion.  In light of the

foregoing, this issue is remanded.


## CONCLUSION

For all of the foregoing reasons, the Department's <u>Final

Results</u>, 75 Fed. Reg. at 47,771, are REMANDED to the agency for

reconsideration and redetermination consistent with this opinion.

Upon remand, Commerce will provide further explanation or

reconsideration of its zeroing policy in administrative reviews

consistent with the Federal Circuit's opinions in <u>Dongbu</u> and

<u>JTEKT</u>; will review the voluntary respondents or provide an

explanation consistent with the statutes, regulations, and

Commerce's policies; and will accept Amanda Foods' separate-rate

certification, conduct the necessary review of the certification,

and reconsider Amanda Foods' duty rate as appropriate.

All other determinations challenged in this case are

AFFIRMED.

Commerce shall have until March 16, 2012 to complete and

file its remand redetermination.  Plaintiffs and Defendant-

Intervenors shall have until March 30, 2012 to file comments.

Plaintiffs, Defendant, and Defendant-Intervenors shall have until

April 13, 2012 to file any reply.

     It is **SO ORDERED**.

_____/s/ Donald C. Pogue_____
Donald C. Pogue, Chief Judge

Dated: January 18, 2012
      New York, New York